

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00176-CV

_____

IN THE INTEREST OF A.I., A CHILD

On Appeal from the 233rd District Court
Tarrant County, Texas
Trial Court No. 233-691866-20

Before Bassel, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

This is an ultra-accelerated appeal[1] in which Appellant F.P. (Mother) and Appellant N.I. (Father) appeal the termination of their parental rights to their daughter Angela[2] following a bench trial. Mother's and Father's parental rights were terminated based on clear and convincing evidence of three predicate grounds—endangering environment, endangering conduct, and failure to comply with their court-ordered service plans—and the best-interest ground. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (b)(2). In five issues, Mother challenges the sufficiency of the evidence to support the four termination findings and the lack of specificity of the service plan. Father's court-appointed attorney filed an *Anders* brief, stating that he did not find any legally nonfrivolous ground constituting error. Because sufficient evidence supports the trial court's findings on endangering conduct, failure to comply with a sufficiently specific court-ordered service plan, and best interest that Mother challenges and because Father's appeal is frivolous, we affirm the trial court's judgment terminating Mother's and Father's parental rights to Angela.

---

[1]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[2]*See* Tex. R. App. P. 9.8(b)(2) (requiring court to use aliases to refer to minors in an appeal from a judgment terminating parental rights).

## II. Factual Background

### A. Overview

Mother has given birth to seven children since 2014. She does not know all of her children's names because some of the children have been adopted. Some of the children went to live with relatives, while other children, like Angela, were removed from the home due to concerns about the parents' conduct. The children for whom Mother did not have custody were born prior to Angela and were fathered by Husband;[3] Father is Angela's father. The testimony at trial revealed that there were initial concerns about drug use, mental-health medication compliance, and housing stability and that other endangering conduct and service-plan compliance failures came to light while the case was pending. Because Mother raises sufficiency challenges, including a challenge to the best-interest finding, we set forth a detailed summary of the testimony from the termination trial.[4]

### B. The Investigator's Testimony

Kimberly Holloway, an investigator with the Department of Family and Protective Services (the Department or CPS), testified that the Department received two referrals in October 2020 regarding Angela, who was a newborn. The first referral alleged that Mother had sought minimal prenatal care, that she had a history

---

[3]Mother had filed for divorce from Husband, but no evidence was admitted showing that he was her ex-Husband at the time of the termination trial.

[4]The bulk of the termination trial was held on April 4, 2022, and then the trial court reconvened the trial on May 11, 2022, "to get an update on some matters."

3

of postpartum depression and was not on any medication, that she had two other children in foster care, and that there had been domestic violence in the home. The second referral alleged that the home visit revealed concerns about the smell of cat feces and urine, that Father appeared to be under the influence, that the parents did not have stable employment, and that there had been previous domestic violence.[5]

Holloway met with Mother at the hospital and questioned her. Mother said that she had smoked marijuana for approximately two months in 2018 but denied any current drug use.[6] Mother admitted that there had been domestic violence between her and Husband. Mother mentioned that she had been diagnosed with depression and said that she was not taking medication but was seeing a therapist. Holloway asked Mother about reports that Mother and Father had planned to have Angela adopted but that they were only doing that for financial gain. Mother admitted that she had planned to put Angela up for adoption because she was struggling financially while she was pregnant and that the prospective adoptive parents had helped her out financially for a couple of months, but Mother said that she had changed her mind because she was doing well financially at the time of Angela's birth. Holloway's concerns after speaking with Mother were varied:

---

[5]Holloway testified that Mother had prior CPS history in October 2019 involving two of her other children and that the allegation was ruled "reason to believe." Angela was Father's first child, and he had no prior CPS history.

[6]Angela's umbilical cord was tested at the hospital, and it was negative for drugs.

4

[One was the] motive for keeping [Angela]. Due to [Mother's] talking about . . . putting her up for adoption and then deciding, I guess, more last minute that she wasn't going to do that after being helped financially by the adoptive parents, and then, of course, the history with her having multiple other children and not having custody of any of those children, and then not being cooperative with services.

To address these concerns, Holloway developed a safety plan for Mother and Father that allowed them to have only supervised contact with Angela. Angela was discharged from the hospital to Father's cousin and his grandmother.

After Angela went home with Father's relatives, Holloway met with Father at the apartment that he shared with Mother. Father said that he had been diagnosed with ADHD and ADD, "but he wasn't really sure." Father denied any drug history, but he agreed to be drug tested. With regard to the parents' prior plan to put Angela up for adoption, Father said that "he wasn't sure how serious [Mother] was about it, but after he thought about things, he couldn't do it."

Holloway sent Father a text on Monday, November 2, 2020, giving him the information about where he should go to provide a urine sample and a hair-strand sample for drug testing, and he said that he could not go until Friday because he was out of town for work. Holloway testified that this concerned her because "with certain drugs, urine tests [are] . . . only going to show positive for a very limited amount of days" as the tests cover a shorter time period, while a hair-strand test goes back three months. After Father submitted the samples, his urine test came back negative, but his hair-strand test was positive for cocaethylene, cocaine metabolite,

marijuana, and one substance that Holloway could not pronounce. When Holloway told Father the results, he said that the urine test showed that he was not currently using drugs and that the positive on the hair-strand test resulted "from something that he had done" before Angela was born.

Mother took a drug test on November 13, 2020. Holloway was notified on November 19 that Mother's hair-strand test was positive for cocaine metabolite. Mother gave several reasons, saying that the epidural and certain medications that she was given at the hospital when she gave birth to Angela could have caused her to test positive. Holloway pointed out to Mother that she and Father had both tested positive for the same substance (despite that Father had not been in the hospital giving birth) and that there was concern that they would be unable to appropriately care for Angela. Holloway requested a removal because the safety plan of placing the children with relatives could not be a long-term placement.[7]

### C. The Caseworker's Testimony

Cecilia Moreno, a caseworker with Our Community Our Kids (OCOK),[8] testified that she was assigned to this case because she was also the caseworker for

---

[7]On cross-examination, Holloway agreed that being somewhere short term is not a reason for removal. Holloway's understanding was that Mother and Father could not have stayed at the apartment where Angela was staying because Mother and Father were not on the lease.

[8]Moreno agreed that OCOK is the agent for the Department for purposes of providing conservatorship services to children and their families when the children are in the conservatorship of the Department.

two of Mother's other children. With regard to the other two children, Mother lagged in starting her services but eventually made some progress. Mother, however, was not able to have the other two children returned to her on a monitored return because she had failed to continue engaging in family therapy with the two children and had failed to be successfully discharged from her therapist. Moreno said that Mother eventually relinquished her parental rights to those two children.

Moreno explained her concerns about Mother's and Father's ability to provide a safe and stable environment for Angela when she came into care. The concerns about Mother included her mental health, housing instability, employment instability, failing to engage in services for prior CPS cases, and drug use. The concerns about Father included drug use, mental health, housing instability, and employment instability. Moreno made a new service plan for Mother with regard to Angela's case and went over it with her in December 2020; Moreno also created a service plan for Father. Mother's service plan required her to participate in individual therapy; to undergo a psychosocial assessment, a mental-health assessment, a psychological, and a substance-abuse assessment; to follow through with any recommended treatment from the substance-abuse assessment; to submit to random drug testing, and to attend weekly visits with Angela. Father's service plan required him to participate in individual therapy; to undergo a psychosocial assessment, a mental-health assessment, a psychological, and a substance-abuse assessment; to follow through with any

7

recommended treatment from the substance-abuse assessment; to submit to random drug testing; to complete parenting classes; and to attend weekly visits with Angela.

Moreno testified that Mother had completed the psychological; had completed a substance-abuse assessment, was unsuccessfully discharged, had reengaged in another substance-abuse assessment/treatment, and was successfully discharged; had completed the mental-health assessment through MHMR and was recommended services for medication management; had completed the psychosocial evaluation; and had submitted to random drug testing and had tested negative during the case.[9]  Based on Mother's progress on her services, the Department initiated unsupervised visits in increments in September 2021.  However, the incremental time of more unsupervised contact ceased the following month when Mother's mother, with whom Mother was living at the time, requested that Mother move out of the home; at that point, there were concerns that Mother did not have a safe and stable place to live.  The following month, Mother's attorney requested an extension of the case.

Moreno testified that as of November 2021, Father had completed his psychosocial assessment, which recommended outpatient services at Lena Pope for individual and group counseling;[10] however, Father had been unsuccessfully discharged in October 2021.  Father had completed his psychological and his

_____

[9]On cross-examination, Moreno testified that Mother had no-showed for a drug test on November 30, 2021.

[10]Moreno testified that the program through Lena Pope offered Father individual counseling in addition to drug treatment through group sessions.

8

parenting class, and he had submitted to random drug testing but had not passed all of his tests. Moreno testified that Father's urine test on December 30, 2020, came back "negative diluted." Additionally, his March 31, 2021 hair-strand test came back positive for amphetamines, methamphetamine, cocaine, and marijuana. Father told Moreno that he had taken Sudafed for a cold and had been around people who were using marijuana, but he denied consuming any drugs. Father also tested positive for cocaine on a June 29, 2021 hair-strand test. Father's urine test was negative on August 3, 2021, but he did not show for requested drug tests on August 31, 2021, and September 21, 2021.

On November 12, 2021, the trial court signed an order extending the dismissal date, setting hearing dates, and setting forth court-ordered services. Moreno testified as to Father's compliance on the court-ordered services: (1) complete a mental-health assessment at MHMR and follow through with any recommendations—did not comply; (2) reengage in individual therapy through Lena Pope until successfully discharged by his therapist—did not comply; (3) submit for random drug testing—did not comply on the two dates requested (November 30, 2021, and January 20, 2022); (4) submit for a substance-abuse assessment through Recovery Resource Council and follow all recommendations—did not comply; (5) provide the Department with proof of employment—did not comply; (6) provide a copy of his lease agreement and monthly payment confirmations—did not comply; (7) maintain safe and stable

9

housing—Father provided his aunt's address in March 2022; and (8) regularly visit Angela—complied.

Moreno testified about her concerns regarding Father's ability to safely parent Angela. Moreno stated that it was a concern that Father did not continue to reengage in services and that he had not addressed the initial concern of drug use, "in addition to also not following through with the mental[-]health assessment." Moreno testified that it was also concerning that he had not submitted to any drug tests since August 2021 and that all of his hair-strand tests had been positive for drugs.

Moreno also testified regarding Mother's compliance with the court-ordered services: (1) continue to attend PACC[11] for individual therapy until successfully discharged by her therapist—discharged unsuccessfully the week prior to trial; (2) submit to random drug tests—complied but concerns existed about her ability to maintain her sobriety going forward because she did not have a support system in place; (3) continue medication management through MHMR and attend all follow-up appointments—no-showed for her November 2021 appointment; (4) continue Narcotics Anonymous/Alcoholics Anonymous (NA/AA) group meetings and provide Moreno with sign-in sheets—provided a document with dates, times, and a signature but no address, and Moreno never received a call back from the alleged signer of the document; (5) provide the Department with proof of employment—provided a pdf file in February 2022 that had no phone number for the individual

---

[11]This acronym was not defined in the record.

10

who wrote the document, no address of the company, and no one responded to the email that Moreno had sent to confirm the legitimacy of the document and Mother's employment; (6) provide a copy of her lease agreement and monthly payment confirmations—provided one confirmation for an apartment from January 27, 2022 to February 27, 2022, with an attachment that continued the lease with no end date and alerted Moreno that she had moved out in March 2022 due to her bank account being frozen;[12] (7) maintain safe and stable housing—did not comply; and (8) regularly visit Angela—complied.

Moreno testified about her concerns regarding Mother's ability to provide a safe and stable home for Angela: "The fact that she has not been . . . stable since the onset of the case. Home stability for her . . . is chaotic. . . . [I]t doesn't seem that she's consistent with . . . home stability and work stability, . . . keeping a job for a few weeks at a time." Moreno had served as Mother's caseworker from March 2020

---

[12]Mother told Moreno that she had moved to a motel room and was donating plasma twice each week to pay for it. The CASA report filed April 1, 2022, noted the following regarding Mother's housing and employment status:

> On 3/23/2022, [Mother] talked with CASA following a visit with [Angela]. She stated that she had to quit the latest job because of [a] lack of transportation. She has moved into a motel close to the CPS office near Las Vegas Trail in west Fort Worth. She does not know how long she can stay there because it costs fifty dollars a night. [Mother] stated [that] she is unemployed but has been selling plasma. She stated that she had a job interview later that week. CASA texted [Mother] to follow up on the outcome of the interview[,] but [Mother] did not respond.

through the trial in April 2022 and had seen patterns regarding actions or inactions with regard to trying to get her children back:

> I've seen the same pattern of behavior from [the other two children's] case where we were so close to reunifying, and then [Mother] failed to follow through with engaging in services, in addition to testing positive, via hair follicle, for cocaine . . . after [Angela] was born. During [the other two children's] case, she was unemployed, and then she got a job, but, again, that didn't last long. She had gotten her apartment [on] April 27[,] 2020. By December, she had already self-reported that she had to leave that apartment and was staying with [Father's] mom . . . until March [2021].
>
> . . . .
>
> . . . She stayed there for a couple of months, and then, again, staying with friends, hotel rooms. And then . . . I saw stability when she was at her mom's house, where she had gone . . . back on her medication, she was taking her medication, attending the services, engaging in the services, and also had that support system in place . . . .
>
> . . . .
>
> . . . Again, she's going from place to place, doesn't have a stable home. Right now, as of yesterday night, she had texted me saying that she had moved . . . to a friend's house, as of yesterday night. And then . . . I believe I had spoken with her last week, I think it was on a Wednesday, that she had said that she was staying at a hotel room, and then a couple weeks before she was at the other apartment that she was staying from January to March 13.

Moreno testified that Mother had self-reported that she was compliant in taking her medications, but she had not provided proof. Moreno had concerns about whether Mother was being honest because "she [had] denied being pregnant [with Angela] even though . . . [Moreno] had confronted her about it, and, subsequently, she [had] lied again about having a miscarriage"; Mother did not admit that she was

12

pregnant with Angela until July 2020 and gave birth in October 2020. Additionally, Mother had told her therapist that she had a theft charge from when she was eighteen years old, despite that it had an offense date in January 2022, when Mother was twenty-seven years old. When Moreno asked Mother why she had told the therapist that the charge was from years prior, Mother acknowledged that she had lied to her therapist and said that "she didn't want the Department to frown upon her and use it against her." Additionally, Moreno had concerns about the documents that Mother had provided to confirm her employment and her attendance at NA/AA meetings:

> Like I said, I did not get any verification as to if she was ever employed there. I . . . received a text from her . . . supervisor . . . . I requested a call[ ]back, trying to set up something. Didn't hear back from them. I sent an e-mail to the e-mail address that the letter provided, didn't receive a call back. In addition to the sponsor's information, the NA classes, . . . I'm not able to verify any information[;] the information that she has provided is technically incomplete if I can't verify it, if there's no way of us knowing if it's true or not.

At the time of the termination trial, Angela was residing in a loving foster home in Tarrant County and had been in that home since November 2021.[13] Moreno said that Angela was "doing really well" in the foster home; she was meeting all her developmental milestones and was engaging and socializing with the other foster siblings in the home. Moreno testified that Angela was bonded to the foster parents. According to Moreno, the foster parents were meeting Angela's emotional,

---

[13]The current foster parents had served as respite caregivers for the initial foster parents who cared for Angela from November 2020 to November 2021, so the current foster parents had known Angela essentially her whole life.

13

developmental, medical, educational, and physical needs, and Moreno opined that they would be able to meet those same needs in the future. Moreno said that Angela had been discharged successfully from her ear–nose-and-throat (ENT) specialist,[14] from speech therapy,[15] and from Early Childhood Intervention (ECI) because she was on target for her age. Moreno testified that the foster parents are interested in adopting Angela.

Moreno requested that the trial court terminate Mother's parental rights based on (D), (E), and (O) predicate grounds (endangering environment, endangering conduct, and failure to complete court-ordered services) and the best-interest ground. Moreno believed that it was in Angela's best interest for Mother's parental rights to be terminated because Mother had not demonstrated stability "since the onset of the case." Moreno explained, "There [are] concerns with her work stability, home stability, continuing to follow through with services or just simple appointments that . . . if they were to be [Angela's] appointments, it would be a concern for . . . meeting [Angela's] basic medical needs, and just the fact that she doesn't have the . . . stability

---

[14]The CASA report filed April 1, 2022, noted that Angela was treated for eustachian-tube bilateral disorder in August 2021 and that she had been discharged from her ENT physician.

[15]The CASA volunteer's report dated September 10, 2021, noted that on August 11, 2021, Angela was evaluated for swallowing problems and speech. She was diagnosed with "developmental disorder of speech and language, unspecified" and was referred to a speech therapist. The speech therapist evaluated Angela on August 24, 2021, and noted that she did not babble or imitate or try to make new sounds.

financially to provide her basic needs at home." Moreno said that Mother had not necessarily been able to meet her own needs on occasion and had to seek help from friends to have a place to stay.

Moreno also requested that the trial court terminate Father's parental rights to Angela based on (D), (E), and (O) predicate grounds and the best-interest ground. Moreno explained that Father had not engaged in services and that the Department was unsure of Father's sobriety, his mental health, his home stability, and his work stability. Moreno said that the last time she had spoken with Father, he was not working but had an interview lined up. To Moreno's knowledge, Father had been staying at his aunt's house for a couple of months prior to the termination trial. Moreno opined that termination of Father's parental rights to Angela is in her best interest because he had failed to engage in services, had failed to demonstrate sobriety through his failure to submit to numerous requested drug tests, and had not participated in services—other than visits—since August 2021.

Regarding Father and Mother as a couple, the Department was "unsure if they would be capable or sober to care for [Angela]." Moreno explained that Angela was "just over a year old" at the time of the trial, that she was still vulnerable, and that it was unclear whether she would have medical needs in the future.

The Department's plan, if Mother's and Father's parental rights to Angela were terminated, was for Angela to be adopted by her foster parents. Moreno opined that such plan was in Angela's best interest.

15

### D. Mother's Testimony

Mother discussed the CPS referrals that had occurred prior to Angela's birth. With regard to the CPS case in December 2015, Mother said that her aunt had called CPS to alert authorities that Husband was hitting Mother. That case was a family-based safety services case in which Mother worked various services. Mother had another CPS case in 2018 after Husband assaulted Mother in front of the children and hit one of the children. Mother again worked family-based safety services, and CPS raised concerns about her mental health and sobriety.

In October 2019, there was a third CPS case after Husband again assaulted Mother, and one of the children had bruises on her face due to Husband. The police arrested Husband, and CPS removed the two children who lived with Mother and Husband and placed the children in foster care.

Also in October 2019 while Mother was married to Husband, Mother met Father through social media. He was seventeen years old at the time. Mother and Father used cocaine together a couple of times, as well as marijuana.[16] Mother said that she had stopped using drugs in February 2020 when she found out that she was pregnant with Angela. When Mother learned that she was pregnant, she and Father talked it over and planned for Angela to be adopted. Mother testified that they had changed their minds by the time that Angela was born in October 2020.

---

[16]Mother testified that she had started using marijuana in 2018 and cocaine in 2019.

As discussed above, Angela was removed a month after her birth due to a variety of factors, including that Mother had tested positive for drugs. Mother admitted that she had tested positive for cocaine metabolite in November 2020. When asked why she had tested positive, she guessed that it was due to sexual contact with Father or "from touching [cocaine] on a table or something." Mother said that there was cocaine in the home when she was pregnant with Angela. On cross-examination, Mother said that she had "passed" the urine sample that she had provided on the same day as the positive hair-strand sample.

Mother discussed her compliance with the service plan that she was given after Angela was removed. Mother testified regarding the stability of her housing and employment, her criminal charge, her mental health, and the visits with Angela.[17]

Mother discussed her living arrangements but could not say how many places she had lived since Angela's birth in October 2020. Mother and Father had an apartment while she was pregnant with Angela and kept the apartment for a while after Angela was born; Mother estimated that they lived in the apartment from June or July 2020 to December 2020 or January 2021. At that point, they could not pay rent, and Father moved out. Mother lived with friends at various times after that. Mother lived with her mother from July 2021 to October 2021, but her mother made

---

[17]Mother also testified that she had completed a parenting class "back in 2020" for the case involving her other children. Mother said that she had learned how to be a better mom, how to discipline (i.e., "not to be[at]"), and that she needed to provide for her children by working and taking care of them. Mother was not asked to complete a parenting class as part of her service plan for Angela's return.

her move out because the rest of Mother's siblings lived there and so "it was getting too much." Mother did not have any other family members locally that she could live with, so she lived in a motel or with friends before she rented her own apartment. Mother testified that she had "lost" her apartment the month before trial. Mother explained that in March 2022, she had tried to spend $1,000 after she had received her income tax refund, that the bank had thought it was a fraudulent transaction and had frozen her account, and that she had not been able to pay rent. Mother said that after losing her apartment, she had stayed in a motel room, but she had moved to a friend's apartment a couple of days before the termination trial. Mother said that she had not looked for an apartment of her own, but she claimed that was her plan.

With regard to her employment, Mother could not recall where she had worked prior to July 2021. In July 2021, she worked at Taco Bell and stayed there for a few months. She then worked at a car wash for a few months before starting work at a senior living center in March 2022. At the time of the trial in April 2022, Mother said that she was still technically employed by the senior living center but had not been going to work because she did not have transportation. Mother testified that she was going to start a housekeeping job at the Omni Hotel on the Wednesday following the trial and that she would be making $25 per hour.

Mother testified that she had a pending criminal charge for theft after being arrested at Walmart. Mother claimed that she had "just had a court date for it and [that] it's getting dismissed."

Mother testified that she had been diagnosed with depression and that she was taking Loxapine to address it. She said that she also saw a therapist and had a phone call with a psychiatrist every few months; her last call was the month before trial.

Mother testified that Angela showed joy during her visits. Mother said that Father did not miss more than two visits and was loving toward Angela during the visits. Mother opined that Father is a good father.

Mother agreed that when the case was set for trial in November 2021, she had asked for more time to complete her court-ordered services and that there were seven tasks that the court ordered her to do. She testified as to her compliance with each of the tasks:

(1) continue to attend PACC for individual therapy until successfully discharged by her therapist—Mother said that she was still seeing her therapist but was having a hard time contacting her because Mother "just got a new phone";

(2) submit to random urinalysis and hair-strand drug tests—Mother said that she had "passed all of them";

(3) continue medication management through MHMR—Mother testified that she was current on all of her medications;

(4) continue with NA/AA meetings, provide sign-in sheets to caseworker, and secure a sponsor—Mother said that she was participating in a group and had a sponsor;

(5) provide the Department with proof of employment via paycheck stubs or documents showing wages earned—Mother admitted that her employment had "been a bit spotty" but testified under oath that she would start a job at the Omni Hotel on the Wednesday after the trial;

(6) provide a copy of her lease agreement and monthly payment confirmation showing that she is current with her rent and household bills—Mother admitted that she did not have a lease agreement; and

(7) maintain safe and stable housing—Mother said that if she had an apartment, she would maintain it for the safety of her daughter.

Mother said that she and Father ended their relationship a few months prior to the April 2022 termination trial because they "decided that it would be best for [their] child for [them] not to be together."

Mother opined that it is in Angela's best interest for Mother to be named her managing conservator. Mother said that she would permit Father to have standard visitation.

### E.    Father's Testimony

Father testified that he had completed some of his services—the parenting class and "a mental evaluation." Father reported on his psychological evaluation that he had begun using cocaine at age fifteen and that at his peak, he had used 3.5 grams per day. Father said that he had told the psychologist about his overdose on cocaine when he was seventeen but did not recall telling him that he had not used cocaine

20

since then. Father acknowledged that he and Mother had used cocaine together from when they met in October 2019 until February 2020 when she found out that she was pregnant. Father denied ever using methamphetamine. Father said that he had last used drugs "over a month" before the trial.

Father explained that with regard to his failure to undergo the random drug testing, his paper ID had expired, and his caseworker did not come to identify him but instead counted the tests as "dirty." Father said that he was one session shy of completing his therapy at Lena Pope; he did not complete it because his father had a hemorrhagic stroke. Father testified about several other family members, including his mother, who had undergone medical crises while he was attempting to work his services and how that affected him. While Father's mother was in the hospital in a medically induced coma due to COVID, he thought that she was going to die; he was angry and relapsed "on drugs and other things like that."

Father said that the Friday preceding the trial, he had contacted MHMR to reengage in services. Father said that his understanding was that he would be able to get an appointment with a doctor to see about getting on medication.

Father said that he loves Angela and that he is bonded with her. He acknowledged his mistakes but said that "to allow her to be taken from [him] is simply spineless and heartless." Father testified that if Angela were returned to him, he would be able to provide a home for her and would ensure that she went to doctor

21

appointments. Father's plan for Angela was to take her out of the city and out of Texas, but he did not provide any additional details regarding his plans for her life.

## F. Attorney and Guardian Ad Litem's Update

The person who served as Angela's attorney and guardian ad litem gave an oral report at trial. She stated that Angela was doing well and was continuing to thrive in the adoption-motivated foster placement that she had been in since November 2021. The ad litem said that Angela is bonded with her foster family, their daughters, and their extended family in Oklahoma. The ad litem said that Angela had graduated from speech therapy and was speaking approximately eighteen words consistently. The ad litem opined that it would be to Angela's detriment if Mother's and Father's parental rights were not terminated because they had not shown that they were capable of providing financially for themselves, much less for a child, and had also not shown that they were capable of providing a stable home for themselves, much less for a child.

## G. The CASA Volunteer's Report

The CASA volunteer filed a report supporting termination, and the Department asked the trial court to take judicial notice of that report. In the report, the CASA volunteer stated that

> [a]ccording to OCOK, [Mother] has not submitted proof of income, housing arrangements[,] or NA meeting attendance. She has been a no-show for therapy appointments and has not completed the required therapy component of her service plan. She has missed scheduled visits with [Angela] because of lack of transportation. [Mother] has not

22

provided OCOK with proof that her prescription medications have been filled or taken. Also, [Mother] did not "refrain from criminal and illegal acts" as she was arrested for allegedly shoplifting at a Walmart in North Richland Hills on January 28, 2022.

With regard to Father, the report stated that he

has reported to CASA that he has had deaths and major illnesses of family members recently [that have] stopped him from being able to complete his service plan. He has been either testing positive or no-showing for drug testing appointments. He has not been employed nor does he have an address. He does not attend therapy sessions. He has not shown proof of taking prescriptions on a regular basis.

The CASA volunteer also provided an update on Angela:

[Angela] appears to be well cared for. Her caregivers have bonded with her. She appears to be a happy child and has age-appropriate toys/activities. . . . [Angela] cuddles with her foster mom and smiles when she sees the other two girls living in the home. . . . [Angela] has regular visits with her parents.

The report concluded with the recommendations that (1) the trial court grant the requested termination of parental rights of Mother and Father as to Angela and (2) Angela remain in the current placement pending adoption.

### H. The Conclusion of the April 4, 2022 Proceedings

At the conclusion of the proceedings on April 4, 2022, the trial court took the matter under advisement. As noted above, the trial court reconvened the trial on May 11, 2022, and heard testimony from Mother and Moreno.

### I. The Remainder of the Trial

At the continuation of the trial, Mother testified about her work situation, her housing, and her plan if Angela were returned to her. Mother said that she had

23

worked at the Omni Hotel from April 22, 2022 to May 2, 2022. Mother testified that on May 9, she had started working at a "better paying job"; the job paid $26 per hour and provided medical and dental benefits. Mother testified that she had been living with a friend at the Broadmoor Apartments[18] for approximately one month and was paying rent to her friend. Mother said that it was a three-bedroom apartment and that there would be room for Angela if she were returned to Mother. When cross-examined about how long she had known this "friend," Mother admitted that she had met her at the apartment complex, that she was a stranger, and that she had moved in with her the same day that she had met her. Mother said that the friend, who had her two children living with her, would let Mother stay with her as long as she needed, but Mother was also looking at apartments to rent. Mother testified that if Angela were returned to her, she had lined up two babysitters to watch her while Mother was at work.

Moreno testified that Father had not entered a drug rehabilitation program, nor had he offered her any proof that he had done so. Father told Moreno that he had undergone a drug assessment the week prior to the trial continuation and that he was referred for inpatient drug treatment but was on a waiting list. Moreno, however, had not been able to confirm that Father had undergone a drug assessment.

---

[18]Mother admitted that Father's aunt lived at the same apartment complex where Mother was living, but she said that she did not know where he lived because she did not talk to him.

24

**J.     The Trial Court's Disposition and the Perfection of these Appeals**

The trial court then provided a summary of the proceedings and an explanation

for the termination ruling:

> At the conclusion of the final trial on April 4[], 2022, the [c]ourt wanted
> to give [Mother] . . . the opportunity to continue to improve her
> situation, but it appears we're still at the same situation we were at that
> day.  We have a job just starting two days ago, where then we were
> having a job that would be starting the next day.  It appears that we're
> continually in the same situation.
>
> [Father] said that he was going to a rehab and did not go into
> rehab, but says I'm trying to get into rehab.  It appears we're at the same
> place and continue to spin our wheels to do the same thing.
>
> I believe that the Department has met its burden in this case and
> wanted to give the parties the opportunity to reverse that, but in this
> [c]ourt's opinion, they have not done that[;] thereby, the [c]ourt finds it
> in the best interest of the child that the [c]ourt moves forward . . . .

The trial court then found clear and convincing evidence of predicate grounds (D),

(E), and (O) and the best-interest ground and terminated Mother's and Father's

parental rights to Angela.  The trial court further found, in accordance with Section

161.001(c), that the order of termination of the parent–child relationship between

Mother and Angela and between Father and Angela was not based on evidence that

Mother and Father were economically disadvantaged.   Mother and Father then

perfected their appeals.

### III.  Burden of Proof and Standards of Review

For a trial court to terminate a parent–child relationship, the party seeking

termination must prove two elements by clear and convincing evidence:  (1) that the

25

parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child

relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that Mother violated a predicate ground listed in Section 161.001(b)(1) and that the termination of the parent–child relationship would be in Angela's best interest. Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## IV.  Mother's Appeal

### A.     Service-Plan Specificity and Compliance[19]

In her fourth issue, Mother argues that the trial court erred by finding that she had failed to comply with her court-ordered service plan "as the service plan was not sufficiently specific enough to warrant termination."  In her third issue, Mother argues that the trial court erred by finding that she had failed to comply with her court-ordered service plan "as worded."[20]  Unlike the scenario in the recent decision from

[19]Although only one predicate ground—along with the best-interest ground—is needed to support a termination order, and although we must address predicate ground (D) or (E) pursuant to the Texas Supreme Court's holding in *In re N.G.*, 577 S.W.3d 230, 235–36 (Tex. 2019), we address Mother's challenges to the predicate ground (O) finding because we utilize Mother's service-plan compliance in the analyses of the endangering-conduct finding and the best-interest finding.

[20]In the issues presented section of Mother's brief, she states that "the only evidence presented of such failures resulted in [a] violation of § 161.001(c)."  *See* Tex. Fam. Code Ann. § 161.001(c)(2) (stating that "[e]vidence of one or more of the following does not constitute clear and convincing evidence sufficient for a court to make a finding under Subsection (b) and order termination of the parent–child relationship:  . . . (2) the parent is economically disadvantaged").  However, Mother makes no argument related to economic disadvantages that prevented her from completing the tasks on her service plan, though she does raise some within her issues that challenge the endangering-conduct and best-interest findings.  We therefore do not address economic disadvantages as to the service-plan finding but will address them when discussing the endangering-conduct and best-interest findings.

Another discrepancy within Mother's third and fourth issues is that although Mother concluded her *fourth* issue challenging the specificity of the service plan with the following sentence—"Mother contends that the evidence is legally and factually insufficient to support a finding that Mother failed to comply with the services order . . . and [that] termination was inappropriate"—it appears that argument was intended to be construed with her *third* issue, which challenges the sufficiency of the evidence to support predicate ground (O).  We therefore broadly construe Mother's third issue

the Texas Supreme Court in which the service plan included only "requests," the service plan at issue here specifically established the actions that Mother was required to take, and the record was clear that she did not complete all of the tasks on her service plan. *See In re A.L.R.*, 646 S.W.3d 833, 837 (Tex. 2022).

## 1. The Law on Subsection (O) and the Specificity Required in a Service Plan

Subsection (O) provides that

> [t]he court may order termination of the parent–child relationship if the court finds by clear and convincing evidence:
>
> (1) that the parent has:
>
> . . . .
>
> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(O).

The Texas Supreme Court recently summarized the law on Subsection (O) and

the specificity required for a parent's service plan:

> Under Subsection (O), "[t]he court may order termination of the parent–child relationship if the court finds by clear and convincing evidence:

_____

as challenging the legal and factual sufficiency of the trial court's predicate ground (O) finding. *See In re Z.M.M.*, 577 S.W.3d 541, 542–43 (Tex. 2019) (instructing courts of appeals to "broadly construe issues to reach all core and substantive questions . . . when reasonably possible"). *See generally* Tex. R. App. P. 38.1(f).

[the parent] failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child." Tex. Fam. Code [Ann.] § 161.001(b)(1)(O). "The [D]epartment . . . must write the service plan in a manner that is clear and understandable to the parent in order to facilitate the parent's ability to follow the requirements of the service plan." *Id.* § 263.102(d). Although the Family Code gives the trial court the discretion to modify the service plan with "any changes . . . it deems necessary[]" and to "render additional appropriate orders to . . . require compliance with" the service plan, the order must comply with the statute's specificity requirement. *Id.* § 263.106.

*A.L.R.*, 646 S.W.3d at 837. Because a trial court must necessarily decide that a court order is sufficiently specific for the parent to comply before terminating a parent's rights under Section 161.001(b)(1)(O), a trial court cannot terminate parental rights for failure to comply without first considering the order's specificity. *N.G.*, 577 S.W.3d at 239 (citing Tex. Fam. Code Ann. § 161.001(b)(1)(O)). We therefore review the specificity of Mother's service plan (her fourth issue) before reviewing her compliance with the service plan (her third issue).

### 2. Analysis of Service Plan's Specificity

In her fourth issue, Mother contends that the service plan was not sufficiently specific: "Either the trial court failed to establish such specificity, at which point the case should be reversed, or it did consider the specificity, at which point it should be held to the exact language it used, as it necessarily approved such language when it ordered compliance." Mother does not point out a deficiency in any of the delineated tasks that would render one or more not sufficiently specific.

30

Here, the record demonstrates that the Department created Mother's initial family service plan on December 11, 2020. Mother received a copy of the plan, and Moreno went over it with her. The plan set forth detailed tasks, such as the following:

- [Mother] will maintain safe[], stable, and appropriate housing. The home must have working utilities at all times. [Mother] will submit verifiable check stubs to show proof of employment. [Mother] must maintain a home that is drug free. [Mother] must provide information for all people living in the home. [Mother] must allow the caseworker to view the home before a recommendation of reunification can be made, including unannounced home visits. [Mother] may contact 2-1-1, United Way of Tarrant for assistance with basic needs, financial assistance, housing, education, legal aid, and health services.

- [Mother] will submit to a drug screening/assessment through Recovery Resource Council and follow through with ALL recommendations made by Recovery Resource staff. This includes, but is not limited to inpatient/outpatient treatment, aftercare services, random drug testing, substance abuse counseling, and attending NA/AA meetings. [Mother] will develop a relapse plan, including arrangements for the care of [Angela]. [Mother] will work to maintain 6 consecutive months of sobriety BEFORE the Department will make a recommendation of reunification.

  TASK IS NOT COMPLETE UNTIL PARENT FOLLOWS THROUGH WITH ALL RECOMMENDATIONS FROM ASSESSMENT STAFF, UP TO AND INCLUDING: INPATIENT, OUTPATIENT, AND NA/AA MEETINGS.

  [Mother] is responsible for calling and setting up appointments.

  CPS will recommend 6 months of sobriety before family reunification will be considered.

  CPS will make the appropriate referrals for this service.

31

Recovery Resource Council
2700 Airport Freeway
Fort Worth, Texas 76077
817-332-6329.

- [Mother] will submit to random drug testing at the request of the caseworker, service provider[,] and the courts. Test may include oral swab, urinalysis, and hair strand. [Mother] must attend drug testing site prior to the close of business on same day requested. [Mother] understands that refusal to submit to drug test request will result in POSITIVE FOR ALL SUBSTANCE.

  [MOTHER] WILL NEED IDENTIFICATION, DRIVER['S] LICENSE OR FORM OF GOVERNMENT ID TO SHOW THE PROVIDER TO SUBMIT A DRUG TEST.

  [MOTHER] WILL REFRAIN FROM ANY DRUG USE AND CRIMINAL ACTIVITY.

  The caseworker will provide collection site information and referrals at the time of the request.

- [Mother] was previously unsuccessfully discharged from therapy. [Mother] will complete psychosocial evaluation[,] and [Mother] will participate in individual counseling through Lena Pope. [Mother] will contact Lena Pope to set up initial appointment and all follow[-]up appointments.

  [Mother] will address the circumstances that led to the child's removal. In addition parent will address home/financial stability, [her] substance abuse history, family violence history, co-parenting, and any issues stemming from the removal. [Mother] will be honest with the therapist in order to facilitate a successful discharge. [Mother] will consistently attend scheduled session with therapist and follow through with any recommendations until discharged by the therapist. If parent is unable to attend a session, [she] will call the provider and reschedule the appointment in a timely manner. If parent fail[s] to cancel a scheduled appointment, [she] will be subject to the provider's attendance/cancellation policy.

32

THE THERAPIST IS THE ONLY PERSON WHO CAN DISCHARGE FOR COMPLETION.

Lena Pope
3200 Sanguinet Street
Fort Worth, Texas 76107
(817) 255-2667

- [Mother] is to complete a mental[-]health assessment through MHMR of Tarrant County. [Mother] is to follow through with all recommendations and requested evaluations. [Mother] is responsible for contacting MHMR in order to schedule the assessment. [Mother] will be honest with staff about any mental health diagnoses and family history.

  [Mother] is to sign a release of information so that assessment information can be made available to the caseworker.

  MHMR of Tarrant County
  3840 Hulen St. North Tower
  Fort Worth, Texas 76107
  817-335-3022

Later, after Father objected to the specificity of the plan, an amended service plan was created on April 12, 2021. Moreno testified that the plan was amended as to the random-drug-testing task and specified that the task was to be completed within twenty-four hours of notification for the parents to attend a local lab.

As can be seen from the sampling of tasks listed above, the family service plan identified the tasks that Mother was required to complete. It was also specific as to what Mother was required to do, where she was required to go for the task, and who bore the responsibility for securing services.

In November 2021, when the trial court granted the motion to extend the dismissal deadline, the trial court also ordered Mother to complete the following services:[21]

A. [Mother] shall continue to attend PACC for individual therapy until she has been successfully discharged by her therapist.

B. [Mother] shall continue to submit to random drug testing to include urine, hair, swab[,] and nail testing. If a positive result, [Mother] shall complete another drug assessment and follow all the recommended services and is not limited to inpatient/outpatient treatment, aftercare services, random drug testing, substance abuse counseling, and attending NA/AA meetings. [Mother] will submit for random drug test within 24 hours of [the] request[] before [the] close of business. Failure to take a requested test will result in the test being considered POSITIVE.

C. [Mother] shall continue her medication management through MHMR and attend all follow[-]up appointments scheduled. [Mother] shall sign Release of Information with MHMR Services of Tarrant County, so OCOK Caseworker can get information and updates about her compliances with the program.

D. [Mother] shall continue NA/AA group meetings and provide OCOK Caseworker sign[-]in sheets. [Mother] shall get a sponsor prior to a monitored return.

E. [Mother] shall provide the Department with proof of employment via paycheck stubs and/or documents that show wages earned monthly to the OCOK Caseworker.

F. [Mother] shall provide a copy of her lease agreement and monthly payment confirmations that demonstrate she is up to date with her rent and household bills. [Mother] will allow OCOK to enter the home to complete an assessment to ensure that the housing is safe and appropriate.

---

[21]Notably, the order does not state whether the services constitute an amended service plan. Nor does the order state that Mother is no longer required to comply with the prior amended service plan.

G. [Mother] shall maintain safe and stable housing for her child. This will be demonstrated by the home being kept in a sanitary manner and free of safety hazards. Sanitary means that the beds, floors, appliances, furniture, counters, sinks, tubs, [and] toilets will be maintained in good working order, free of debris, standing water, standing urine/feces, animal feces, animal urine, drug . . . paraphernalia, alcohol[,] and prescription medications [that] might create risk for the child. [Mother] shall allow announced and unannounced visitation to the home by the caseworker Cecilia Moreno or other designated OCOK caseworker and shall notify the caseworker within 72 hours (3 days) of relocating or change in telephone number.

These tasks were similarly specific to those in the initial and amended family service plans with which Mother was already familiar. For example, Mother was not simply required to be employed; instead, the trial court ordered her to show "proof of employment via paycheck stubs and/or documents that show wages earned monthly to the caseworker." Likewise, Mother was not simply required to maintain safe and stable housing for her child; instead, the plan specified how that would be demonstrated—"by the home being kept in a sanitary manner and free of safety hazards"—and "sanitary" was defined in detail.

In the recent case from the Texas Supreme Court, the plan stated, "The Department *requests* that [the father] participate in parenting classes." *A.L.R.*, 646 S.W.3d at 837. The supreme court concluded that "[b]ecause the Department requested (rather than required) the completion of various tasks to achieve mandatory goals, the plan was ambiguous as to the specific actions required to obtain the child's return under Subsection (O)." *Id.* at 838. Unlike the service plan in *A.L.R.*, Mother's

35

service plan included mandatory "shall" language as to each task that the court ordered her to complete.

Based on the level of detail and clear identification of tasks, we hold that the services listed in the trial court's November 12, 2021 "Order Extending Dismissal Date, Setting Hearing Dates, and Court-Ordered Services" was sufficiently specific because it set forth the terms of compliance with certainty and informed Mother what duties and responsibilities had been imposed. *See In re B.C.*, No. 01-21-00590-CV, 2022 WL 1216175, at *7 (Tex. App.—Houston [1st Dist.] Apr. 26, 2022, pet. denied) (mem. op.) (holding service plan sufficiently specific when it contained provisions similar to those here); *In re D.K.J.J.*, No. 01-18-01081-CV, 2019 WL 2455623, at *15 (Tex. App.—Houston [1st Dist.] June 13, 2019, pet. denied) (mem. op.) (holding that the service-plan requirements with which mother failed to comply were sufficiently specific). Accordingly, we overrule Mother's fourth issue.

### 3. Analysis of Mother's Service-Plan Compliance

In her third issue, Mother argues that the evidence is insufficient to support the trial court's Subsection (O) finding. Mother does not contest that (1) Angela has been in the permanent or managing conservatorship of the Department for at least nine months, (2) Angela came into the Department's care as a result of removal from Mother under Chapter 262 due to abuse or neglect, and (3) the trial court issued an order that established the actions necessary for her to obtain Angela's return. Mother

36

instead attempts to parse the wording of the tasks on the service plan to show that she complied, but her attempts are to no avail.

For instance, with regard to the first task—"[Mother] shall continue to attend PACC for individual therapy until she has been successfully discharged by her therapist"—Mother argues that she was continuing to go "but was simply having trouble contacting her therapist due to [Mother's] getting a new telephone." Mother contends that the language of the requirement was that she continue until successful discharge and that it did not mention that the task could be "violated by an unsuccessful discharge." Mother further contends that "if she had reconnected with her therapist and resumed services after an unsuccessful discharge and was subsequently successfully discharged, this would have satisfied the exact language of the order." But Mother's argument is conditioned on a scenario that is not demonstrated in the record—"*if* she had reconnected with her therapist and resumed services." [Emphasis added.] There is no evidence that Mother restarted individual therapy; instead, the evidence is that she was "unsuccessfully discharged" the week prior to the April termination trial. Mother thus did not demonstrate compliance with the first task.[22]

With regard to the third task, the evidence demonstrated that Mother had no-showed for her November 2021 appointment for her medication management with

---

[22]With regard to the second task, we agree with Mother that she had complied with random drug testing, though there was one mention that Mother had failed to show for a drug test in November 2021.

MHMR.  While this alone is not enough to support termination under Subsection (O), it demonstrates that Mother did not "attend *all* follow[-]up appointments" as required by her service plan.  [Emphasis added.]

With regard to the fourth task, which required Mother to provide the caseworker with sign-in sheets for NA/AA group meetings, the record demonstrates that Mother provided a document with dates, times, and a signature but no address.  When the caseworker attempted to verify that the document was what it purported to be, she never received a call back from the alleged signer of the document.  Mother claims that "technically speaking, she was not required to provide documents that were easily verifiable, and thus the fact that they were difficult to verify should not be construed against Mother."  While Mother's contention is "technically" correct, it begs comprehension that the trial court intended for Mother to be allowed to submit a fake sign-in sheet or a document that could not be verified.

With regard to the fifth task, Mother was required to provide the Department with documents that showed wages earned monthly.  Mother points to evidence that she provided the caseworker with her paystubs from Taco Bell.  The caseworker, however, testified that Mother had provided paystubs from Taco Bell for September 2021 to November 2021.  Mother claims that "[t]his alone, technically, satisfies this requirement."  Mother, however, ignores that the order specifically required her to provide wage documentation monthly.  Moreover, the order setting forth the service plan was dated November 2021, and the trial began in April 2022.  The record

38

demonstrates that during that time period, Mother had provided only a pdf file in February 2022 that had no phone number for the individual who wrote the document and no address for the company that was allegedly employing Mother. Based on the lack of information, the caseworker was unable to confirm the legitimacy of the document and Mother's employment. Moreover, even if that document could have been verified, it does not show compliance with the task that requires *monthly* documentation of her wages, and Mother testified that she had been employed at a car wash for a few months before taking a job at a senior living center in March 2022. Thus, Mother did not comply with the fifth task.

Regarding the sixth task, Mother was required to provide a copy of her lease agreement and monthly payment confirmations demonstrating that she was current on her rent and household bills. Mother argues, "Again, it is important to note that this does not specifically require her to have a lease agreement[] or any household bills. The caseworker testified that she was provided with documentation regarding [Mother's] apartment. Maintaining the same apartment was not a condition of [this task]." [Record reference omitted.] As with the first task, Mother attempts to parse the plain language of the trial court's order. Mother claims that the task does not specifically require her to have a lease agreement or household bills; we disagree. The task *presumes* that she will have a lease; it does not state that she "shall provide a copy of her lease agreement[, *if any*,] and monthly payment confirmations that demonstrate she is up to date with her rent[, *if any*,] and household bills[, *if any*]." The trial court

39

could have included such wording if it had intended to allow Mother to have living arrangements other than renting an apartment or a house. Moreover, there is no evidence, and Mother does not argue, that she ever provided monthly payment confirmations demonstrating that she was current on her household bills. Mother thus failed to comply with the sixth task on her court-ordered service plan.

With regard to the final task requiring Mother to maintain safe and stable housing, Mother argues that she testified at the April portion of the trial that "she would maintain her home for her daughter" and that she testified at the reconvened trial in May that "her current home was appropriate for her daughter, including a well-stocked fridge and room for her to stay." Mother, however, ignores the "stable" requirement that is explicit in the seventh task. Mother had been living in the stranger's apartment for only about five weeks at the time the termination trial concluded on May 11, 2022. Prior to that time, Mother had lived with various friends and in motels. Mother thus failed to comply with the seventh and final task on her service plan.

Viewing all evidence in the light most favorable to the trial court's Subsection (O) finding, resolving all disputed facts in favor of this finding if a reasonable factfinder could do so, and disregarding evidence that a reasonable factfinder could have disbelieved, we conclude that the evidence would enable a reasonable factfinder to form a firm belief that Mother failed to complete the family service plan. *See J.F.C.*, 96 S.W.3d at 266; *B.C.*, 2022 WL 1216175, at *8. We hold that the evidence is legally

sufficient to support the finding that Mother failed to comply with a court order that established the actions necessary to obtain Angela's return. *See B.C.*, 2022 WL 1216175, at *8; *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(O).

Considering the entire record, the evidence that cannot be credited in favor of the finding is not so significant that a factfinder could not reasonably have formed a firm belief that Mother failed to complete the family service plan; Mother's arguments to the contrary do not create doubt about whether the tasks were completed.[23] We hold that the evidence is factually sufficient to support the finding that Mother failed to comply with a court order that established the actions necessary to obtain Angela's return. *See B.C.*, 2022 WL 1216175, at *9; *In re L.C.L.*, 599 S.W.3d 79, 86 (Tex. App.—Houston [14th Dist.] 2020) (en banc op. on reh'g) (holding evidence legally and factually sufficient to support termination under predicate ground (O) because mother failed to show up for all scheduled drug tests, failed to attend individual therapy, and failed to attend domestic-violence counseling), *pet. denied*, 629 S.W.3d 909 (Tex. 2021); *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(O). We therefore overrule Mother's third issue.

---

[23]No evidence was presented to demonstrate that Mother was unable to comply or that her failure to comply was not her fault, and she does not argue this on appeal. *See* Tex. Fam. Code Ann. § 161.001(d) (setting forth affirmative defense that a court may not order termination under Subsection (O) based on the parent's failure to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that the parent was unable to comply with specific provisions of the court order and the parent made a good-faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent).

## B.    Endangering-Conduct Challenge

In her second issue, Mother argues that the evidence is insufficient to support the trial court's endangering-conduct finding.[24]    Viewing the evidence in the light most favorable to the trial court's finding, as we are required to do, we hold that the record contains legally sufficient evidence of endangering conduct.

### 1.    The Law on Conduct-Based Endangerment

Subsection (E) requires a finding that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child.    Tex. Fam. Code Ann. § 161.001(b)(1)(E).  To "'[e]ndanger' means to expose to loss or injury, to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *8 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.).

Conduct-based endangerment under Subsection (E) requires more than a "single act or omission"; it requires a "voluntary, deliberate, and conscious course of conduct." *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *13 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.).  As a course of conduct, evidence of endangerment under Subsection (E) "is not limited to actions directed towards the

---

[24]Mother does not specify whether she is challenging the finding for legal or factual sufficiency.  Because Mother prays that we reverse the termination order and "instruct the return of the child to her care," which would require a rendition rather than a remand, we presume that Mother is challenging solely the legal sufficiency of the finding.

42

child," *In re J.F.-G.*, 627 S.W.3d 304, 315 n.43 (Tex. 2021) (quoting *J.O.A.*, 283 S.W.3d at 345), and may include "actions before the child's birth, actions while the child is not in the parent's presence, and actions while the child is in the Department's custody." *See In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *2 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.). Because a parent's illegal drug use exposes her child to the possibility the parent may be impaired or imprisoned, evidence of illegal drug use supports a finding that the parent engaged in a course of conduct that endangered the child's physical or emotional well-being. *See J.O.A.*, 283 S.W.3d at 345. As we have previously noted,

> Also as part of the endangering-conduct analysis, a court may consider a parent's failure to complete a service plan. *See In re R.F.*, 115 S.W.3d 804, 811 (Tex. App.—Dallas 2003, no pet.).
>
> As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See* [*In re*] *S.D.*, 980 S.W.2d [758,] 763[ (Tex. App.—San Antonio 1998, pet. denied)]. A factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.). Further, "evidence of improved conduct, especially of short[ ]duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." . . . *J.O.A.*, 283 S.W.3d [at] 346 . . . .

*In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.). Additionally, "[a] parent's mental health is frequently considered in reviewing the sufficiency of the evidence under

endangerment grounds." *In re J.P.-L.*, 592 S.W.3d 559, 583 n.26 (Tex. App.—Fort Worth 2019, pet. denied).

### 2. Analysis

Mother focuses her argument on the following portion of Moreno's testimony:

[Mother] has not had stability since the onset of the case. There [are] concerns with her work stability, home stability, continuing to follow through with services or just simple appointments that . . . if they were to be [Angela's] appointments, it would be a concern for . . . meeting [Angela's] basic medical needs, and just the fact that she doesn't have the . . . stability financially to provide her basic needs at home.

Mother contends that such "evidence does not establish clearly and convincingly a course of conduct that endangers the child, especially given that the trial court found that it did not establish violations of [S]ubsection (E) as a result of Mother['s] being economically disadvantaged."[25] The trial court, however, was entitled to consider more than that single portion of Moreno's testimony.

The trial court could have based its endangering-conduct finding on Mother's admission that she had started using marijuana in 2018 and cocaine in 2019 and had used drugs until she found out that she was pregnant with Angela;[26] her failure to

---

[25]Despite Mother's specific reliance on Section 161.001(c), which explains that a court may not terminate based on a parent's being economically disadvantaged, the Department does not address or even mention Section 161.001(c) in its brief.

[26]It is also possible that the trial court disbelieved Mother's testimony that she had stopped using cocaine when she discovered that she was pregnant with Angela because Mother's hair-strand test from the month after she gave birth to Angela was positive for cocaine metabolite. Additionally, the record shows that Mother had other

44

demonstrate compliance with her depression medication;[27] her failure to be discharged successfully from therapy; her arrest for theft;[28] and her continued involvement with Father up until a few months prior to the April 2022 termination trial, which was during the time that he was continuing to test positive for drugs (or no-showing for requested drug tests).[29] None of these acts or omissions rely on Mother's economic disadvantages. Moreover, neither the trial court nor this court is required to negate the probative value of Mother's history of irresponsible choices merely because there was some evidence of improved conduct for a short duration. *See J.O.A.*, 283 S.W.3d at 346. Having looked at all the evidence in the light most favorable to the challenged finding and determined that a reasonable factfinder could have formed a firm belief or conviction that the finding is true, we hold that the

children in her possession until October 2019, which was during the time that she was using marijuana, if not both marijuana and cocaine.

[27] *See, e.g.*, *In re E.G.*, 643 S.W.3d 236, 253 (Tex. App.—Amarillo 2022, no pet.) (stating that because the evidence showed that before and after the child's birth mother did not take the medication that was prescribed for her depression and anxiety, the trial court could have concluded that mother's failure to take the medication after the child's birth endangered the child's well-being).

[28] *See, e.g.*, *In re D.B.S.*, No. 05-20-00959-CV, 2021 WL 1608497, at *6 (Tex. App.—Dallas Apr. 26, 2021, pet. denied) (mem. op.) (noting in endangerment analysis that mother "was also arrested for theft, though the case was later dismissed").

[29] *See, e.g.*, *E.G.*, 643 S.W.3d at 253 ("The trial court could have concluded that [m]other's ongoing relationship with [f]ather [who was using drugs] jeopardized her substance[-]abuse recovery[] and posed a risk to [the child's] emotional and physical well-being."); *In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (holding that factfinder could reasonably infer from a parent's refusal to take a drug test that the parent was using drugs).

45

evidence is legally sufficient to support the trial court's finding that Mother engaged in conduct or knowingly placed Angela with persons who engaged in conduct that endangered Angela's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *E.R. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-20-00033-CV, 2020 WL 3968233, at \*7 (Tex. App.—Austin July 7, 2020, no pet.) (mem. op.) (holding evidence legally sufficient to support endangering-conduct finding when evidence showed, among other things, that Mother had stopped therapy before being successfully discharged and had used drugs).[30] We overrule Mother's second issue.

## C. Best-Interest Challenge

In her fifth issue, Mother argues that the trial court erred by finding that it was in Angela's best interest for Mother's parental rights to be terminated.[31] Mother's

---

[30]Because we affirm the trial court's termination order on the basis of Subsection (E), which subjects Mother to the applicability of Section 161.001(b)(1)(M) as a potential ground for termination for any children she may have in the future, we need not address the sufficiency of the evidence supporting the termination of Mother's parental rights under Subsection (D), which she challenges in her first issue. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (stating that court may order termination of parent–child relationship if court finds by clear and convincing evidence that parent has had a parent–child relationship "terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)"). *See generally N.G.*, 577 S.W.3d at 235–36 (holding that due process requires a court of appeals to address challenged findings under Section 161.001(b)(1)(D) or (E) of the Texas Family Code because of the collateral consequences as to other children under Section 161.001(b)(1)(M), even if other findings support termination of parental rights).

[31]We construe Mother's argument as challenging the legal sufficiency of the trial court's best-interest finding.

failings—many of which were identified in the predicate-grounds analysis—support the trial court's best-interest finding.

### 1. Law on Best Interest

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A) the [child's] desires . . . ;

(B) the [child's] emotional and physical needs[,] . . . now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F) the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### 2.     Analysis

Here, Mother's brief fails to provide any analysis of the *Holley* factors. Instead, Mother argues that the only best-interest evidence that the Department presented was "tied up with the statutory grounds for termination," that the ad litem's reasoning was based on the fact that Mother was economically disadvantaged, and that the Department put on no evidence that Mother lacked parenting skills. We will address the first two arguments in turn and then address Mother's parenting skills as part of our analysis of the *Holley* factors.

48

Mother's first argument—that the only best-interest evidence that the Department presented was "tied up with the statutory grounds for termination"—ignores that case law permits the predicate-grounds evidence to be considered in evaluating the best-interest ground. As stated above, evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) predicate ground. *E.C.R.*, 402 S.W.3d at 249. The Department was therefore not required to put on a different set of evidence to prove up the best-interest ground than it did to prove up the predicate grounds. *See id.*

With regard to the ad litem's termination recommendation—that "neither parent [was] capable of providing a stable home for themselves, much less for a child; have the financial wherewithal to take care of themselves, much less for a child; [and] lack the stability"—it is clear that the trial court did not give weight to such testimony as the trial court specifically stated in the termination order that the termination of Mother's parental rights was not based on evidence that Mother is economically disadvantaged. As explained above in the endangering-conduct analysis and as explained below in the *Holley*-factor analysis, the evidence revealed other bases besides the fact that Mother was economically disadvantaged. Accordingly, we conclude that the termination of Mother's parental rights was not improper just because some of the best-interest evidence indicates that she is economically disadvantaged. *See In re A.F.*, No. 10-19-00335-CV, 2020 WL 1313450, at *19 (Tex. App.—Waco Mar. 19, 2020, no pet.) (mem. op.).

49

Turning now to the *Holley* factors, as to the first factor, Angela was approximately eighteen months old at the time of the termination trial. She was therefore too young to express her desires regarding whether she wanted to live with Mother. *See In re R.S.D.*, 446 S.W.3d 816, 818, 820 (Tex. App.—San Antonio 2014, no pet.) (holding that the child, who was "almost four years old" at the time of trial, was "too young to have stated his desires"). Because there was no evidence of Angela's desires, this factor is neutral. *See In re X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.) ("[T]he first *Holley* factor is neutral because no evidence of the children's desires was presented.").

As to the second factor,[32] the record demonstrates that Angela previously had medical needs that involved her inability to speak and swallow properly and a eustachian-tube disorder, but by the time of the trial, she had been discharged from speech therapy, her ENT specialist, and ECI because she was on target for her age. The record did not list any specific medical or emotional needs beyond those typical for Angela's age. However, Moreno stated that due to Angela's young age, "[W]e're

---

[32]With regard to the second and third factors that focus on the child's emotional and physical needs and danger to the child now and in the future, this court has recently noted, "Children need long-term safety and stability." *In re V.S.*, No. 02-22-00063-CV, 2022 WL 2252775, at *4 (Tex. App.—Fort Worth June 23, 2022, pet. denied) (mem. op.) (first citing Tex. Fam. Code Ann. § 263.307(a) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."); then citing *In re M.A.J.*, 612 S.W.3d 398, 411 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (op. on reh'g); and then citing *A.C. v. Tex. Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 705–06 (Tex. App.—Austin 2019, pet. denied)).

not sure as to if there's any other medical needs in the future" and noted concerns about Mother's ability to meet Angela's basic medical needs due to her failure to follow through with her own "services or just simple appointments." Moreover, the initial referral in the record notes that two of Mother's prior children were removed from the home due to "failing to provide ongoing medical care for special needs of the children." This factor weighs slightly in favor of the trial court's best-interest finding.

Relevant to the third and eighth factors—emotional and physical danger to the child and acts or omissions that may indicate an improper parent–child relationship— is the evidence that Mother had moved in with a stranger days before the termination trial started and planned to have Angela live with her in the stranger's apartment. Additionally, Mother was arrested for theft while the termination case was pending, she was discharged unsuccessfully from individual therapy, and there were concerns about her truthfulness when she said that she was compliant with taking her depression medication.[33] Mother admitted to using marijuana and cocaine prior to learning of her pregnancy and tested positive for cocaine metabolite the month after Angela was born, though this is somewhat mitigated by the fact that she had not

---

[33] *See, e.g.*, *In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at *25 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.) (stating that a parent's lack of progress in managing her mental-health condition is relevant to the best-interest determination); *In re J.-M.A.Y.*, No. 01-15-00469-CV, 2015 WL 6755595, at *7 (Tex. App.—Houston [1st Dist.] Nov. 5, 2015, pets. denied) (mem. op.) (noting that evidence that a parent is noncompliant with prescribed psychiatric medication is not consistent with providing a safe and stable environment for the children).

tested positive for drugs since then even though she continued to be in a relationship with Father (who continued to test positive throughout the case) until a few months prior to the termination trial. Moreover, prior to Mother's relationship with Father and Angela's conception, Mother had prior CPS history due to being the victim of domestic violence at the hands of Husband, but Mother testified that she had filed for divorce from Husband. These factors weigh slightly in favor of the trial court's best-interest finding.

The aforementioned evidence is also relevant to the fourth *Holley* factor regarding Mother's parenting abilities. In contrast to Mother's failures listed above, the record demonstrates that Mother regularly visited with Angela, and no parenting issues were noted at the visits. As for the parenting abilities of the foster parents, the record demonstrates that they were meeting Angela's emotional, developmental, medical, educational, and physical needs, and Moreno opined that they would be able to meets those same needs in the future. The record notes that Angela was thriving in her foster home. This factor is neutral.

As to the fifth *Holley* factor—programs available to the parties seeking custody—it is evident from the detailed factual background section and the analysis of predicate ground (O) above that Mother did not comply with multiple tasks on her service plan. This factor weighs in favor of the trial court's best-interest finding.

Regarding the sixth factor that deals with the parties' plans for Angela, Mother's plans for Angela included that she would live in the apartment with Mother

52

and the stranger (as well as the stranger's children) and that a babysitter would keep Angela while Mother was at work. The Department's plan was for Angela to be adopted by her current foster parents who were adoption motivated and had been part of Angela's life throughout the case, as they had served as respite care for her caregivers while she was living in the initial foster home. This factor weighs slightly in favor of the trial court's best-interest finding.

As to the ninth factor, involving excuses for the parent's acts or omissions, Mother missed several visits due to a lack of transportation, had lost an apartment due to having her bank account frozen for suspected fraud, and had to quit a job due to lack of transportation after she lost her apartment. But we do not count these against Mother as they could constitute evidence that Mother was "economically disadvantaged." *See* Tex. Fam. Code Ann. § 161.001(c)(2). With regard to not completing therapy, Mother said that she had obtained a new phone and was having trouble contacting her therapist. As to the positive hair-strand test after Angela was born, Mother blamed it on the epidural or medications given to her in the hospital, sexual contact with Angela's father, or "touching [cocaine] on a table or something" because she said that there was cocaine in the home while she was pregnant with Angela. Additionally, Mother had denied being pregnant with Angela when Moreno first asked her; had later told Moreno that she had a miscarriage; and had ultimately admitted her pregnancy to Moreno in July 2020, despite learning in February 2020 that she was pregnant. Moreover, Mother had lied to her therapist about her January

2022 arrest on the theft charge, claiming that it had occurred when she was eighteen years old. This factor weighs in favor of the trial court's best-interest finding.

We finally address the seventh *Holley* factor as to the stability of the home or proposed placement. *See In re G.N.*, No. 13-18-00464-CV, 2018 WL 6815502, at *9 (Tex. App.—Corpus Christi–Edinburg Dec. 27, 2018, no pet.) (mem. op.) ("A child's need for permanence through the establishment of a 'stable, permanent home' has been recognized as the paramount consideration in determining best interest."). Here, Mother had been living in a stranger's apartment for a few days prior to the start of the April termination trial and did not know how many places she had lived since Angela was born; she testified that she had initially lived in an apartment with Father but then had lived with various friends, with her mother, in various motels, in her own apartment, and in the apartment with the stranger that she met right before the termination trial. Mother testified that the stranger would let her live with her as long as she needed but that she (Mother) was also going to look for an apartment. Mother did not appear to have a plan in place for a permanent home. By contrast, Angela had been placed in a stable home, and the Department's plan was for her to be adopted by that family. The record demonstrated that Angela was thriving in the home, that her needs were being met, and that she had formed a bond with her foster parents. Consideration of the seventh *Holley* factor weighs in favor of termination. *See V.S.*, 2022 WL 2252775, at *5–6 (concluding that seventh factor weighed in favor of trial court's best-interest finding because father's living situation was uncertain and varied

from living in an unlivable camper to a Motel 6 to being homeless at various points during the case while the child was in a stable home with plans for adoption); *G.N.*, 2018 WL 6815502, at *9–10 (concluding that seventh factor weighed in favor of termination because mother was recently homeless and gave conflicting plans about moving to Dallas or staying long-term in Ingleside while the four children were thriving in their foster families who intended to adopt the children).

Overall, having considered the trial record in the light most favorable to the judgment, we conclude that a reasonable trier of fact could have formed a firm belief or conviction, based on clear and convincing evidence, that termination of Mother's parental rights to Angela was in Angela's best interest. *See V.S.*, 2022 WL 2252775, at *6–7 (holding evidence legally sufficient to support best-interest finding, despite father's excuse of being economically disadvantaged, because most of the evidence constituting father's bad acts—drug abuse and criminal history—was irrelevant to his financial situation); *A.F.*, 2020 WL 1313450, at *18–19 (holding evidence legally sufficient to support best-interest finding and concluding that termination "was not improper just because some of the evidence indicated that [mother was] economically disadvantaged" when evidence revealed that there was domestic violence in the home and that mother was using illegal drugs); *G.N.*, 2018 WL 6815502, at *8–10 (holding evidence legally sufficient to support best-interest finding, despite mother's financial struggles demonstrating that she was economically disadvantaged and that she had not tested positive for drugs since the children were removed, because mother had been

cited twice previously for neglectful supervision of her children and had not demonstrated any kind of significant change as a result of complying with the nonfinancial tasks on her service plan and was recently homeless with no concrete plan for permanency). Though the evidence is not overwhelming, we hold that it is legally sufficient to rebut the strong presumption that keeping Angela with her biological mother is in her best interest. *See* Tex. Fam. Code Ann. § 153.131; *G.N.*, 2018 WL 6815502, at *10. Accordingly, we overrule Mother's fifth issue.

## V. Father's Appeal

Father's court-appointed appellate attorney filed a motion to withdraw as counsel and a brief in support of that motion, averring that after diligently reviewing the record, he believes that the appeal is frivolous. *See Anders v. California*, 386 U.S. 738, 744–45, 87 S. Ct. 1396, 1400 (1967); *see also In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, no pet.) (reasoning that *Anders* procedures apply in noncriminal appeals when appointment of counsel is mandated by statute). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. Although given the opportunity, Father did not file a response. The Department filed a letter stating that it would not be submitting a response to the *Anders* brief.

As the reviewing appellate court, we must independently examine the record to decide whether an attorney is correct in determining that the appeal is frivolous. *See*

*Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *In re K.R.C.*, 346 S.W.3d 618, 619 (Tex. App.—El Paso 2009, no pet.). Having carefully reviewed the record and the *Anders* brief, we agree that Father's appeal is frivolous. We find nothing in the record that might arguably support Father's appeal. *See Bledsoe v. State*, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005).

## VI. Conclusion

Having overruled Mother's second through fifth issues, which are dispositive of her appeal, and having held that nothing in the record might arguably support Father's appeal, we affirm the trial court's judgment terminating Mother's and Father's parental rights to Angela.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: September 22, 2022

57